Filed 3/16/21  In re N.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>E.R.,<br><br>    Defendant and Appellant. | E075370<br><br>(Super.Ct.Nos. J278644 & J278645)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

At the 18-month Welfare and Institutions Code section 366.22[1] hearing, the juvenile court terminated defendant and appellant's, N.R. (father), reunification services. On appeal, father contends plaintiff and respondent, San Bernardino County Children and Family Services (CFS), (1) failed to provide him with reasonable reunification services, and (2) insufficient evidence supports the juvenile court's finding that placement of the children[2] in father's custody posed a substantial risk of detriment to the children's physical or emotional well-being. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 18, 2018, CFS personnel received a report that mother's[3] boyfriend (MB) had dropped the children off at the maternal aunt's (MA) home because social services were after him, and the children were going to be taken away. The MA reported the children were covered in scabies and lice. She had no authority to take the children to the hospital or enroll them in school. The children were never taken to the doctor because they did not have medical insurance.

The MA said she reported mother to CFS personnel in August 2018, but assumed mother fled so CFS staff were unable to intervene. On October 21, 2018, the MA took the children to the emergency room, where they were treated. The MA reported the

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Three children were involved in the case, only two of whom were father's: S.R., born July 2012, and N.R. born October 2015 (collectively, the children).

[3] Mother is not a party to the appeal.

2

children rarely, if ever, went to the doctor or dentist; their teeth were in "very poor condition."

The MA reported S.R. was not, but should have been, enrolled in first grade. When the children would visit mother, they would complain about being hungry. Mother was transient, moving from hotel to hotel. The MA reported that father was currently incarcerated for unknown reasons.[4] Mother and MB would leave the children alone in hotels while they were working. The children all saw MB as their father.

Mother reported being in an off-and-on relationship with MB for the past 10 years, during which they had engaged in domestic violence throughout. She also reported being in an off-and-on relationship with father for the past seven years, during which they had engaged in daily domestic violence, which was witnessed by the children.[5]

Father reported that he needed to enroll in a 52-week domestic violence program due to being recently incarcerated for three months, having been released on October 30, 2018. Father related his arrest had been for domestic violence with his wife.[6] He denied any concerns of domestic violence with mother. Father said he had contact with the

---

[4] According to CFS personnel, prior to their involvement, father had never been involved in the children's lives. The social worker wrote in the 12-month review report that father "refuses to take responsibility for not being a part of his children's lives until CFS became involved . . . ."

[5] It is unclear how the children could have witnessed daily domestic violence between mother and father when the record repeatedly reflects that father had never met the children prior to CFS's involvement.

[6] Mother was not father's wife.

children except when he was incarcerated.  Father tested negative for controlled substances after an on-demand drug test.

CFS personnel filed juvenile dependency petitions alleging, with respect to father, that he lived a transient lifestyle (b-8), engaged in domestic violence in the presence of the children (b-9), failed to obtain adequate medical care for the children's scabies (b-10), failed to obtain adequate medical care for the children's lice (b-11), failed to provide for the children's basic needs (b-12), and failed to obtain adequate dental care for the children (b-13).  The court detained the children on November 16, 2018.

In the jurisdiction and disposition report filed December 4, 2018, the social worker recommended the children be removed and father receive reunification services.  Mother reported she had been with father for seven or eight years.  Father would slap and choke her when she was pregnant.  Mother's eldest child, L.C., had witnessed physical altercations between them.  The eldest child knew to get help by knocking on the walls for the neighbors.  Mother left the children with MB because it was safer since she was homeless; the children stayed with him for four or five months before CFS became involved.

L.C. disclosed witnessing an incident where father grabbed mother by her hair.  She said once, father pushed mother and broke a glass.  S.R. identified father as his father; he stated that he liked to stay with father.  Father denied any domestic violence between himself and mother.  He said he had never lived with her.  Father said he had "'always been caring for the kids.'"

4

Father's proposed case plan included a domestic violence program, general counseling, and parenting education. The domestic violence program was to address "such issues as: power/control, anger management, empathy training, impulse control, fear/intimidation and/or manipulation."

On December 7, 2018, the matter was continued for mediation. The mediation report recounted that father agreed to submit to rewritten b-8 and b-9 allegations,[7] and dismissal of allegations b-10 through b-13. Father agreed to reunification services consisting of domestic violence treatment, individual counseling, and parenting.

At the jurisdiction and disposition hearing on January 17, 2019, father's counsel submitted on the mediation agreement. The court found allegations b-8 and b-9 true as rewritten and dismissed allegations b-10 through b-13. The court removed the children from parents' custody and ordered reunification services.

In a nonappearance review on May 23, 2019, the social worker reported father was having weekly supervised visits with the children, and the visits were going well. The children reported they enjoyed seeing father; father had completed his case plan. The social worker recommended the court approve unsupervised weekly visitation for father, which the court granted.

---

[7] The b-8 and b-9 allegations were effectively swapped. The b-8 allegation now read: "The father . . . has a history of domestic violence, placing the child[ren] at risk." The b-9 allegation now read: "The father . . . failed to provide the appropriate food, shelter, and clothing, placing the child[ren] at risk."

In the July 17, 2019 status review report, the social worker recommended continued reunification services be provided to father and that the children remain in placement. Father had completed his services on March 23, 2019. Father's counselor recommended he engage in six sessions of family counseling so the children could share their story of removal with father. The sessions had not yet occurred due to father's full-time employment and the distance between father and the children.

Father was having weekly supervised visitation with the children, which had been going well. The social worker noted that during one supervised visit, the children were coloring with father, talking, and having a good time. Father's unsupervised visitation was to begin on July 5, 2019. Father was still renting a room and reported he needed stable and appropriate housing and childcare while he is working so that the children could be placed in his custody. The social worker concluded, "Once [father] obtains appropriate housing, then the children could be placed with him."

At the status review hearing on July 17, 2019, father submitted on the recommendations. The court said, "Dad is doing well." Father's progress was described as substantial. The court continued reunification services for six months.

In the status review report filed December 23, 2019, the social worker recommended continued reunification services. Father continued to have unsupervised day visits but had been unable to move to overnight and/or weekend visits due to problems with his previous roommate not cooperating with CFS for fingerprinting. The children enjoyed their visits with father. Father resided in a studio apartment, where there were no beds for the children.

The social worker expressed concerns due to father taking the children to his home prior to CFS approval and telling the children not to say anything to the social worker or CFS because they would get him in trouble. Father had made demands of the caregivers that they dress the children in a certain way and attempted to negotiate additional visits with the caregivers without informing the social worker.

Father had reportedly yelled at the children for calling mother's husband "'step dad,'" and saying, "'Don't call him dad, he's not your dad and tell your mom he's not your dad.'" Father "badmouthed" the social worker to the foster parents in front of the children. Father consistently denied playing any part in the reasons the children had been removed. He refused to take responsibility for not being involved in the children's lives until CFS was contacted.

At the status review hearing on January 6, 2020, counsel for CFS noted: "And, your Honor, with regards to the father, we would ask—right now his visits are in Long Beach; that's where he lives. We're asking that visits be in this area, San Bernardino area. The reason for that is that he is having his girlfriend present at the visits. She hasn't Live Scanned. We haven't been able to verify her background and determine if she's safe or not to be around the children."

Counsel for CFS further noted: "He's also made statements that he doesn't want the children to speak to the social worker about what's going on and that the children are getting him in trouble. He's been—overall he's been difficult in dealing with the social worker, so at this time we'd ask that the girlfriend not be present at the visits and that visits occur in this area." The court continued reunification services and ordered that

7

CFS personnel had the authority to determine the location of the visits and that no unauthorized third parties be present.

In a nonappearance review on January 21, 2020, the social worker reported that the caregivers had informed her that S.R. told them they "drove far" to pick up father's paycheck, that father made him cry, that father told him again that he keeps getting father in trouble, and that father's girlfriend continued to attend visits. The court granted the social worker's recommendation to reduce visitation to supervised, once weekly, for two hours.

In the status review report filed June 11, 2020, the social worker recommended the court terminate father's reunification services. Father had been "laid off" due to "COVID-19." Father "ha[d] been extremely difficult to communicate with" and "minimize[d] and/or denie[d] any part in CFS's involvement with his children." The social worker noted that father had used racial slurs when referring to the CFS manager, had used derogatory terms to describe a same sex couple who were previously the children's caretakers, and had accused CFS and court staff of not knowing how to do their jobs. Father's therapist was surprised to hear the allegations; she reported that father "is very polite and cooperative during sessions with her." She also reported that "father had been able to acknowledge and accept his absence in the lives of his children until CFS involvement."

The social worker reported that the "children often reported to the previous caregivers and to different CFS staff that they were 'afraid that my dad is going to be mad and yell at us because we tell you things.'" After visitation was reduced, father

8

refused to arrange visits for several weeks. However, visits resumed at the end of February 2020. When the children were transported to one visit, CFS staff reported that the children said they were afraid father was going to be mad and yell at them. The children were reportedly hesitant to go to father; however, the visit went well, and father and the children appeared to enjoy their time together. Father had "made demands that CFS pay his rent because [CFS] was asking too much of him by asking him to accommodate his children's needs for visits or asking [him] to participate in services."

The social worker observed: "The father appears to spend his time focusing on the anger he feels toward CFS and the Juvenile Dependency system rather than listening to and meeting his children's needs, [with] whom he admittedly had no prior relationship before the children came to the attention of CFS. [¶] In view of the information presented above, it appears that to return the children home would create a substantial risk of detriment to the physical and/or emotional well-being of the minors because the parents have been unable or unwilling to comply with their case plan services."

In an additional information for the court report filed June 16, 2020, the social worker noted father and the children had begun family therapy on June 5, 2020. According to father's individual therapist, father was upset at having to participate. Father responded that it was a "'misunderstanding'" and that he simply did not like the way "'he was spoken to.'"

At the 18-month hearing on June 17, 2020, father's counsel objected to the social worker's recommendation noting, "It appears Father has completed the case plan." Counsel for CFS and minor agreed that father had completed his services but contended

9

that he had not benefitted from them.  They argued that father was difficult to work with and had some anger management issues.  They further noted that father's visitation had reverted from unsupervised to supervised.

The court found that CFS personnel had provided father with reasonable services, but stated, "Father . . . has not benefitted from his services, while he did complete his case plan."[8]  The court found that there was a substantial risk of detriment to the children if placed in father's custody and terminated his reunification services.

## II.  DISCUSSION

### A.     *Reasonableness of Services.*

Father contends that to the extent CFS maintains his anger management issues provide the basis of the detriment finding, the court erred in concluding reasonable services were offered to him with respect to anger management.  We disagree.

"'The paramount goal in the initial phase of dependency proceedings is family reunification.  [Citation.]'  [Citation.]  'At a disposition hearing, the court may order reunification services to facilitate reunification between parent and child.'  [Citation.] Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.'  [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.'"  (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

---

**8** The minute orders erroneously reflect that the court found father had failed to complete his court ordered case plan.  Likewise, in her oral pronouncements, the court adopted the findings prepared by the social worker; those findings erroneously reflect that father had failed to complete his court ordered services.

The department "'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." [Citation.]' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] 'The applicable standard of review is sufficiency of the evidence.'" (*In re T.G.*, *supra*, 188 Cal.App.4th at p. 697.)

Here, father's case plan consisted of a domestic violence program, general counseling, and parenting education. The domestic violence program was to address "such issues as: power/control, *anger management*, empathy training, *impulse control*, fear/intimidation and/or manipulation." (Italics added.) Moreover, father's therapist noted that they had worked on issues such as father's "outbursts and reactions to hearing things he may not agree with . . . ." Thus, sufficient evidence supports the court's conclusion that CFS provided, and father both participated in and completed, services directed at anger management.

### B. Detriment.

Father contends insufficient evidence supports the juvenile court's finding that placement of the children in father's custody posed a substantial risk of detriment to the children's physical or emotional well-being. We disagree.

11

"'If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child. Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parent's custody.'" (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660 (*M.G.*).) "[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400; see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490 [same]; *In re E.D.* (2013) 217 Cal.App.4th 960, 965 [same]; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 [same].)

"We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] '"Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.'" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Here, substantial evidence supports the juvenile court's determination that placement of the children with father would be detrimental to the children's physical and or emotional well-being. Father was never able to obtain suitable housing such that the children could be placed with him, even over the course of more than 18 months since the children's detention. Father reverted from unsupervised to supervised visitation. He

12

continually denied any responsibility for CFS' involvement in the case, despite admitting allegations that he had a history of domestic violence and had failed to provide for the children, both of which placed them at risk.

Father continually attempted to circumvent court orders regarding where he could take the children, which individuals could be present, and how often he could engage in visitation. Indeed, the children reported that father continued to have his girlfriend present even after the court expressly forbade her presence at visits. He attempted to compel the children into not reporting violations. Father increasingly expressed anger toward the children such that he made them cry and they were afraid of him. (*In re Mary B*. (2013) 218 Cal.App.4th 1474, 1483 [substantial evidence of detriment where father completed domestic violence program, but continued to yell in minor's presence and minor remained scared of him].) Father's anger issues extended to outbursts toward the social workers, CFS staff, and the caregivers. Thus, sufficient evidence supported the social worker's and court's determinations that father had failed to benefit from his services, and placement of the children with him posed a substantial risk of detriment to their physical and/or emotional well-being.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

CODRINGTON
J.

MENETREZ
J.

14